JOSÉ A. CABRANES, Circuit Judge.
We are here confronted by land, claims of historic vintage — the wrongs alleged ocr curred over two hundred years ago, and this action is itself twenty-five years old— which we must adjudicate against a legal *268 backdrop that has evolved since the District Court’s rulings. The United States District Court for the Northern District of New York (Neil P. McCurn, Judge), determined (1) that treaties between the Cayuga Nation and the State of New York in 1795 and 1807 were not properly ratified by the federal government and were thus invalid under the Nonintercourse Act, 25 U.S.C. § 177; and (2) that none of defendants’ other arguments barred plaintiffs’ suit. After ruling in plaintiffs’ favor on liability, the District Court conducted a jury trial on damages, which resulted in a verdict for plaintiffs of approximately $36.9 million, representing the current fair market value of the land as well as fair rental value damages for 204 years. The District Court then concluded, following a month-long hearing, that plaintiffs were entitled to about $211 million in prejudgment interest, resulting in a total award of $247,911,999.42.
In another case raising land claims stemming from late-eighteenth-century treaties between Indian tribes and the State of New York, the Supreme Court recently ruled that equitable doctrines— such as laches, acquiescence, and impossibility — can be applied to Indian land claims in appropriate circumstances. See City of Sherrill v. Oneida Indian Nation, 544 U.S. —, —, 125 S.Ct. 1478, 1494, 161 L.Ed.2d 386 (2005). Based on Sher-rill, we conclude that the possessory land claim alleged here is the type of claim to which a laches defense can be applied. Taking into account the considerations identified by the Supreme Court in Sher-rill and the findings of the District Court in the remedy stages of this case, we further conclude that plaintiffs’ claim is barred by laches. Accordingly, we reverse the judgment of the District Court and enter judgment for defendants.
BACKGROUND
Because of the disposition we reach here, we need not describe in great detail the long history of relations between the Cayuga Nation and the State of New York. We set forth below a concise description of the events underlying this lawsuit, as well as a more extended recounting of the case’s procedural history.
1. Historical Background
Plaintiffs allege that from time immemorial until the late eighteenth century the Cayuga Nation owned and occupied approximately three million acres of land in what is now New York State, a swath of land approximately fifty miles wide that runs from Lake Ontario to the Pennsylvania border.- This- action involves 64,015 acres of that land, encompassing the Cayuga’s “Original Reservation,” as set forth in a treaty with the State of New York, concluded on February 25, 1789 (“1789 Treaty”). In the 1789 Treaty, the Cayugas ceded all of their lands to New York, except the lands designated as the “Original Reservation,” which consists of lands on the eastern and western shores of the northern end of Cayuga Lake.
Congress passed the first Indian Trade and Intercourse Act, known as the “Nonin-tercourse Act,” in 1790, pursuant to Congress’s power under Article I, Section 8, clause 3 of the Constitution, which gives Congress the power “to regulate Commerce ... with the Indian Tribes.” Act of July 22, 1790, ch. 33, § 4, 1 Stat. 137, 138. As the Supreme Court described it, “the Act bars sales of tribal land without the acquiescence of the Federal Government.” Sherrill, 125 S.Ct. at 1484. Successive versions of the Act have been continuously in force from that time to the present day. See Rev. Stat. § 2116, 25 U.S.C. § 177.
On November 11, 1794, the Six Iroquois *269 Nations[1] entered the Treaty of Canan-daigua with the United States. 7 Stat. 44. This treaty acknowledged the Original Reservation the Cayugas retained in the 1789 treaty with New York, and promised the Cayugas that the land would remain theirs until they “chose to sell the same to the people of the United States who have the right to purchase.” Id. art. II, 7 Stat. at 45. On June 16, 1795, William Bradford, then Attorney General of the United States, issued an opinion concluding that, under the 1793 version of the Noninter-course Act, no Indian land sale was valid, nor could the land claims of the Six Iroquois Nations be extinguished, except pursuant to a treaty entered into by the Federal Government. See Cayuga Indian Nation v. Cuomo, 565 F.Supp. 1297, 1305 (N.D.N.Y.1983) (“Cayuga I”).
On July 27, 1795, the Cayuga entered into a treaty with the State of New York in which the State acquired the entire Original Reservation of the Cayugas (except for a three-square-mile area on the eastern shore of Cayuga Lake) in exchange for a promise that the State pay the Cayuga Nation $1,800 annually in perpetuity. Id. Although there is some debate about whether a federal official who signed the treaty as a witness was acting in a personal or official capacity, id., it is undisputed that this treaty was never explicitly ratified by a treaty of the Federal Government. In 1807, the State of New York purchased the Cayugas’ remaining three-square-mile parcel for $4,800. Id. Again, the Federal Government never explicitly ratified this treaty.[2]
2. Procedural History — Liability Phase
Many years later, on November 19, 1980, the Tribe filed its complaint in this action, alleging these facts and requesting that the Court “[djeclare that plaintiffs are the owners of and have the legal and equitable title and the right of possession” to all of the land in the Original Reservation and that the Court “[rjestore plaintiffs to immediate possession of all portions of the subject land claimed by any defendant or member of the defendant class and eject any defendant claiming their chain of title through the 1795 and 1807 New York State ‘treaties.’ ” Plaintiffs also sought: (1) an accounting of all tax funds paid by possessors of the lands; (2) trespass damages in the amount of the fair rental value of the land for the entire period of plaintiffs’ dispossession; (3) all proceeds derived in the future in connection with the removal or extraction of any natural resources to be placed in a trust fund for plaintiffs’ benefit; (4) the costs of the action and attorneys’ fees; and (5) “such other and further relief as the Court deems just.”
Soon after filing the action, plaintiffs moved to certify a defendant class of landowners under Federal Rule of Civil Procedure 23(b)(1)(B). The District Court certified a defendant class with respect to liability and named defendant Miller Brewing Company as representative of the defendant class. In 1981, the Seneca-Cayuga Tribe of Oklahoma was granted leave to intervene as plaintiff-in- *270 tervenor and filed a complaint in intervention that was in pertinent respects identical to the original complaint filed by the Cayuga Nation of New York.
Defendants moved to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). After the District Court denied the motion to dismiss, and defendants filed their answer to the complaint, plaintiffs moved for partial summary judgment, asking the Court to find the 1795 and 1807 treaties invalid under the Nonintercourse Act and federal common law and to determine that plaintiffs were the current owners of the lands in question. The District Court found that plaintiffs constituted “Indian tribes” and that they were entitled to sue under the Nonintercourse Act, but held that it could not rule on whether the United States ratified the treaties as the record was not yet complete. Cayuga Indian Nation v. Cuomo, 667 F.Supp. 938, 942-43, 948 (N.D.N.Y.1987) (“Cayuga II”) The District Court also rejected defendants’ arguments that the suit was barred by various doctrines, including election of remedies, res judicata, and collateral estoppel. Id. at 946-48.
After further discovery, plaintiffs again moved for partial summary judgment, asking that the Court find that the treaties had not been properly ratified. The District Court concluded that the Noninter-course Act requires of any land-conveyance treaty with an Indian tribe (1) the presence of federal treaty commissioners at the signing of the treaty and (2) ratification, pursuant to the Treaty Clause of the U.S. Constitution. Cayuga Indian Nation v. Cuomo, 730 F.Supp. 485, 487 (N.D.N.Y.1990) (“Cayuga III”). The Court granted plaintiffs partial summary judgment on this issue, concluding that there was no evidence that the treaties had been ratified pursuant to the Treaty Clause. Id. at 493.
In separate opinions in 1991, the District Court rejected defendants’ remaining defenses of abandonment and laches. Cayuga Indian Nation v. Cuomo, 758 F.Supp. 107 (N.D.N.Y.1991) (“Cayuga IV”); Cayuga Indian Nation v. Cuomo, 771 F.Supp. 19 (N.D.N.Y.1991) (“Cayuga V”). The Court determined that the “1794 Treaty of Canandaigua conferred recognized title to the Cayugas concerning the land at issue” and that “proof of the plaintiffs’ physical abandonment of the property at issue is irrelevant in a claim for land based upon reserved title to Indian land, for such title can only be extinguished by an act of Congress.” Cayuga IV, 758 F.Supp. at 118. With regard to laches, the District Court concluded that Second Circuit precedent was clear that “claims brought by Indian tribes in general, including the plaintiffs herein, should be held by courts to be timely, and therefore not barred by laches, if, at the very least, such a suit would have been timely if the same had been brought by the United States.” Cayuga V, 771 F.Supp. at 22 (citing Oneida Indian Nation v. Oneida County, 719 F.2d 525, 538 (2d Cir.1983)). The Court thus found plaintiffs’ action timely. Id. at 24.
Following these rulings, the District Court granted partial summary judgment on liability to plaintiffs against all defendants except the State of New York, which was excluded because it had asserted a new Eleventh Amendment defense based on the then-recent Supreme Court decision in Blatchford v. Native Village of Noatak, 501 U.S. 775, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991). Cayuga V, 771 F.Supp. at 21 n. 2, 24. The other defendants then moved to dismiss on the grounds that the State was an indispensable party.
In response to the State’s Eleventh Amendment motion, the United States *271 moved to intervene in the lawsuit on behalf of itself and on behalf of plaintiffs. The complaint-in-intervention sought a declaration that plaintiffs were entitled to possession of the land, ejectment of the current residents, and damages and interest. The motion to intervene was granted in November 1992.
After a stay of the proceedings for settlement discussions that lasted over three years, the District Court concluded that the State was entitled to Eleventh Amendment immunity, but that its officials could be sued for prospective relief. The Court denied the non-State defendants’ motion to dismiss, rejecting their contention that the State was an indispensable party. Having ruled on all liability issues, the Court noted that it “anticipated receiving an application for certification of an interlocutory appeal.” Defendants decided not to seek an interlocutory appeal.
3. Procedural History — Damages Phase
After the ruling for plaintiffs on all liability issues, a number of questions remained to be decided at the damages phase. Defendants argued (1) that ejectment was not a proper remedy in the case; (2) that plaintiffs should not be able to obtain prejudgment interest against the State; (3) that damages should be limited to the loss suffered by the Cayugas at the time of the treaties, as measured by the difference between the value received by the Cayugas and the fair market value of the lands at that time; (4) that the lands should be valued as a single 64,000-acre tract rather than as smaller, individual tracts; and (5) that damages should be based on a single valuation date of July 27, 1795.
The District Court issued a series of rulings in 1999 to resolve these and other issues relating to the damages proceedings. First, the District Court agreed with defendants that the land should be valued as a single parcel (“4” above) and that damages should be determined by reference to the value of the land on July 27, 1795 (“5” above). Cayuga Indian Nation v. Pataki, No. 80-CIV-930, 1999 U.S. Dist. LEXIS 5228, at *18-19 (N.D.N.Y. Apr. 15, 1999) (“Cayuga VIII”). In that same ruling, the Court found that plaintiffs’ potential damages consisted of damages at the time of the Treaties and the fair rental value of the Cayugas’ loss of use and possession of the land for the years of dispossession, known as “mesne profits.” Id. at *51-53. The Court determined that the award of prejudgment interest was an issue for the Court, and not for the jury, and that the Court would decide issues related to interest once the record had been further developed. Id. at *60-75 & n. 35.
The Court next decided, on July 1, 1999, fully nineteen years after the filing of the complaint seeking “immediate possession” of the land, that ejectment was not a proper remedy. Cayuga Indian Nation v. Cuomo, No. 80-CIV-930, 1999 U.S. Dist. LEXIS 10579, at *97 (N.D.N.Y. July 1, 1999) (“Cayuga X”). The Court found that “monetary damages will produce results which are as satisfactory to the Cayugas as those which they could properly derive from ejectment.” Id. at *79. Because ejectment was the only relief plaintiffs were seeking against the individual State defendants, the Court dismissed the claims against those defendants. Id. at *99.
On October 8, 1999, the District Court ruled that the State of New York “could be deemed an original or primary tortfeasor.” Cayuga Indian Nation v. Pataki, 79 F.Supp.2d 66, 74 (N.D.N.Y.1999) (“Cayuga XI ”). Consequently, the Court determined that “a single trial against the State *272 of New York as the sole defendant is the only practical way to proceed here.” Id. at 77. As a result, the remedial proceedings held in the District Court and discussed below.pertain only to the State as defendant.
The Court further ruled, on December 23, 1999, that it would not allow testimony related to equitable issues to be presented to the jury and that all equitable issues would be reserved to the Court. Cayuga Indian Nation v. Pataki, 79 F.Supp.2d 78, 92 (N.D.N.Y.1999) (“Cayuga XII”). The Court decided that, because it had rejected ejectment as an available remedy, it would allow evidence of current fair market value as a proper measure of damages. Id. at 94. As a result of these rulings, the District Court bifurcated the proceedings into (1) a jury trial to determine current fair market value and rental damages and (2) a subsequent hearing on prejudgment interest and other equitable issues.
A jury trial was held from January 18, 2000 through February 17, 2000. The parties’ experts presented widely disparate estimates of the measure of plaintiffs’ damages. The jury was presented with a Special Verdict Form that asked for a calculation of current fair market value of the subject land and for a year-by-year breakdown of rental damages from 1795 to 1999. The jury was instructed not to adjust rental damages to current day value, as all adjustments would be performed later by the Court. On February 17, 2000, the jury returned a verdict -finding current fair market.value damages of $35 million and total fair rental value damages of $3.5 million. In awarding the fair rental value damages, the jury awarded the same rental value damages for each year from 1795 to 1999, in the amount of $17,156.86. The jury gave the State a credit for the payments it had made to the Cayugas, of about $1.6 million, leaving the total damages at this stage at approximately $36.9 million.
The hearing on prejudgment interest and other equitable issues was held from July 17, 2000 through August 18, 2000. Eight expert witnesses testified, regarding both the historical context and the assessment of prejudgment interest. Unsurprisingly, the experts reached substantially divergent estimates of the prejudgment interest to which the Cayugas were entitled, ranging from approximately $1.75 billion to zero (this counterintuitive calculation was based on the assumption that the jury verdict needed to be “adjusted” because the jury had expressed its verdict in “constant 2000 dollars”).[3]
On October 2, 2001, the District Court issued a Memorandum-Decision and Order on the interest issue. Cayuga Indian Nation v. Pataki, 165 F.Supp.2d 266 (N.D.N.Y.2001) (“Cayuga XVI”). The District Court rejected both the “lowball” figure of the State’s expert and the stratospheric figure of the plaintiffs’ expert and relied on the estimate of the United States’s expert, who had arrived at a figure of $529,377,082. Id. at 364. In doing so,.the District Court took into account a number of equitable considerations, including “(1) the passage of 204 years; (2) the failure of the U.S. to intervene or to seek to protect the Cayuga’s interests prior to 1992; (3) the lack of fraudulent or calculated purposeful intent on the part of the State to deprive the Cayuga of fair compensation for the lands ceded by them in the 1795 and 1807 treaties; and (4) the financial factors enumerated by [the *273 State’s expert].” Id. at 366. The District Court noted that these financial factors encompassed a number of considerations, including the question whether the Cayugas had access to financial markets or “the ability, knowledge, or skills to take advantage of such markets, especially in the early years,” the failure of the verdict to take into account the Cayugas’ expenses over the past 204 years, the fact that the unimproved claim area had no rental value until the twentieth century, and the fact that compounding interest over 204 years is at best “a theoretical exercise,” because it ignores the history of banking in this country and is extremely unlikely to occur in a real-world market. Id. at 364. In light of all these factors, the District Court adjusted downward the interest estimate by 60 percent, resulting in a prejudgment interest award of $211,000,326.80 and a total award of $247,911,999.42. Id. at 366. The District Court entered judgment that day.
The District Court addressed various post-judgment motions on March 11, 2002. Cayuga Indian Nation v. Pataki, 188 F.Supp.2d 223 (N.D.N.Y.2002) (“Cayuga XVII”). The Court first denied the State’s motions for judgment as a matter of law and for a new trial. Id. at 247-48. The Court granted the State’s motion “to amend the judgment to provide that it runs jointly in favor of the U.S., as trustee, and the tribal plaintiffs,” but denied the State’s motion “to amend the judgment to run exclusively in favor of the U.S.” Id. at 257. Finally, the Court denied both parties’ motions for recalculation of the prejudgment interest and plaintiffs’ motion for reconsideration of the Court’s earlier decision rejecting ejectment as a remedy. Id.
On June 17, 2002, the District Court granted the parties’ motions for permission to appeal and certified for appeal, pursuant to 28 U.S.C. § 1292(b), the issues related to liability and remedies. We granted the District Court’s certification of issues for immediate appellate resolution on December 11, 2002.
DISCUSSION
The Supreme Court’s recent decision in City of Sherrill v. Oneida Indian Nation, 544 U.S. —, 125 S.Ct. 1478, 161 L.Ed.2d 386 (2005), has dramatically altered the legal landscape against which we consider plaintiffs’ claims. Sherrill concerned claims by the Oneida Indian Nation, another of the Six Iroquois Nations, that its “acquisition of fee title to discrete parcels of historic reservation land revived the Oneidas’ ancient sovereignty piecemeal over each parcel” and that, consequently, the Tribe need not pay property taxes to the City of Sherrill. Id. at 1483. The Supreme Court rejected this claim, concluding that “the Tribe cannot unilaterally revive its ancient sovereignty, in whole or in part, over the parcels at issue.” Id.
We understand Sherrill to hold that equitable doctrines, such as laches, acquiescence, and impossibility, can, in appropriate circumstances, be applied to Indian land claims, even when such a claim is legally viable and within the statute of limitations. See, e.g., id. at 1494 (“[T]he distance from 1805 to the present day, the Oneidas’ long delay in seeking equitable relief against New York or its local units, and developments in the city of Sherrill spanning several generations, evoke the doctrines of laches, acquiescence, and impossibility, and render inequitable the piecemeal shift in governance this suit seeks unilaterally to initiate.”). Sherrill clarified that the decision does not “disturb” the Supreme Court’s holding in County of Oneida v. Oneida Indian Nation, 470 U.S. 226, 229-30, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985) (“Oneida II”), *274 which allowed Indian Tribes to seek fair rental value damages for violation of their possessory rights following an ancient dispossession. See Sherrill, 125 S.Ct. at 1494 (“In sum, the question of damages for the Tribe’s ancient dispossession is not at issue in this case, and we therefore do not disturb our holding in Oneida II”). Because the Supreme Court in Oneida II expressly declined to decide whether laches would apply to such claims, see Oneida II, 470 U.S. at 244-45, 253 n. 27, 105 S.Ct. 1245, this statement in Sherrill is not dispositive of whether laches would apply here.
The Court’s characterizations of the Oneidas’ attempt to regain sovereignty over their land indicate that what concerned the Court was the disruptive nature of the claim itself. See id. at 1483 (“[W]e decline to project redress for the Tribe into the present and, future, thereby disrupting the governance of central New York’s counties and towns.”); id. at 1491 (“This long lapse of time, during which the Oneidas did not seek to revive their sovereign control through equitable relief in court, and the attendant dramatic changes in the character of the properties, preclude [the Tribe] from gaining the disruptive remedy it now seeks.”); id. at 1491 n. 11 (“[The Oneidas’] claim concerns grave, but ancient, wrongs, and the relief available must be commensurate with that historical reality.”). Although we recognize that the Supreme Court did not identify a formal standard for assessing when these equitable defenses apply, the broadness of the Supreme Court’s statements indicates to us that Sherrill’s holding is not narrowly limited to claims identical to that brought by the Oneidas, seeking a revival of sovereignty, but rather, that these equitable defenses apply to “disruptive” Indian land claims more generally.
In their post-Sherrill briefs, both the Cayugas and the United States maintain that the Sherrill decision “does not affect the award of monetary damages,” Cayuga Letter Br. at 1, and “concerned particular equitable remedies” which are not at issue here as “the district court confined its judgment to an award of damages.” United States Letter Br. at 6. Our reading of Sherrill suggests that these assertions do not present an entirely accurate assessment of its effect on the present case. While the equitable remedy sought in Sherrill — a reinstatement of Tribal sovereignty — is not at issue here, this case involves comparably disruptive claims, and other, comparable remedies are in fact at issue.
Despite the eventual award by the District Court of monetary damages, we emphasize that plaintiffs’ claim is and has always been one sounding in ejectment; plaintiffs have asserted a continuing right to immediate possession as the basis of all of their claims, and have always sought ejectment of the current landowners as their preferred form of relief. As noted above, in their complaint in this case the Cayugas seek “immediate possession” of the land in question and ejectment of the current residents. Indeed, the District Court noted early in the litigation that it was “clear” that the complaint “presents a possessory claim, basically in ejectment.” Cayuga I, 565 F.Supp. at 1317 (internal quotation marks omitted).[4] Plaintiffs continue to maintain, on appeal in this Court, that ejectment is their preferred remedy. It was not until 1999, nineteen years after the complaint was filed, and eight years after the District Court’s decision on liabil *275 ity, that the District Court determined that the ejectment remedy sought by the Cayugas was, “to put it mildly, ... not an appropriate remedy in this case.” Cayuga X, 1999 U.S. Dist. LEXIS 10579, at *97. The District Court thus effectively “monetized” the ejectment remedy in concluding that “monetary damages will produce results which are as satisfactory to the Cayugas as those which they could properly derive from ejectment.” Id. at *79.
The nature of the claim as a “pos-sessory claim,” as characterized by the District Court, underscores our decision to treat this claim like the tribal sovereignty claims in Sherrill. Under the Sherrill formulation, this type of possessory land claim — seeking possession of a large swath of central New York State and the ejectment of tens of thousands of landowners— is indisputably disruptive. Indeed, this disruptiveness is inherent in the claim itself — which asks this Court to overturn years of settled land ownership — rather than an element of any particular remedy which would flow from the possessory land claim. Accordingly, we conclude that pos-sessory land claims of this type are subject to the equitable considerations discussed in Sherrill.
This conclusion is reinforced by the fact that the Sherrill opinion does not limit application of these equitable defenses to claims seeking equitable relief. We recognize that ejectment has been characterized as an action at law, as opposed to an action in equity. See, e.g., New York v. White, 528 F.2d 336, 338 (2d Cir.1975) (discussing “the legal remedy of ejectment”); but see Bowen v. Massachusetts, 487 U.S. 879, 893, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988) (stating in dicta that “[o]ur cases have long recognized the distinction between an action at law for damages — which are intended to provide a victim with monetary compensation for an injury to his person, property, or reputation — and an equitable action for specific relief — which may include an order providing for ... ejectment from land .... ”). Plaintiffs urge us to conclude that, as a legal remedy, ejectment is not subject to equitable defenses, relying, inter alia, on the Supreme Court’s statement in Oneida II that “application of the equitable defense of laches in an action at law would be novel indeed.” Oneida II, 470 U.S. at 244 n. 16, 105 S.Ct. 1245. In response to this claim, we note Sherrill’s statement that “[n]o similar novelty exists when the specific relief [the Tribe] seeks would project redress ... into the present and future.” 125 S.Ct. at 1494 n. 14. Whether characterized as an action at law or in equity, any remedy flowing from this possessory land claim, which would call into question title to over 60,000 acres of land in upstate New York, can only be understood as a remedy that would similarly “project redress into the present and future.”[5]
*276 One of the few incontestable propositions about this unusually complex and confusing area of law is that doctrines and categorizations applicable in other areas do not translate neatly to these claims. See, e.g., Oneida, II, 470 U.S. at 240-44, 105 S.Ct. 1245 (holding that the general law favoring the borrowing of state law limitations-periods does not apply to federal Indian land claims); Mohegan Tribe v. Connecticut, 638 F.2d 612, 614-15 & n. 3 (2d Cir.1980) (holding that adverse possession does not run against Indian land). This proposition was well stated by the District Court:
As the parties are well aware, the Cayugas are seeking to enforce a “federal common law” right of action for violation of their possessory property rights, as well as seeking to vindicate their rights under the Nonintercourse Act Unfortunately, that Act is silent as to remedies, thus leaving courts to resort to the common law as a means of “assisting ... in formulating a statutory [Nonintercourse Act] damage remedy.” Therefore, in molding a remedy in the present case and in structuring a manageable trial, in the court’s opinion it may well be appropriate, and indeed necessary, to fashion a federal common law remedy, which although having some resemblance to remedies available for common law torts such as trespass, is a remedy uniquely tailored to fit the needs of this unparalleled land claim litigation. As the discussion below demonstrates, however, and has been evident for some time as the issue of remedies has come to dominate this litigation, common law prinei-pies, whether tort-based or not, are not readily transferrable to this action.
Cayuga XI, 79 F.Supp.2d at 70-71 (internal citations, quotations, and emphasis omitted). In light of the unusual considerations at play in this area of the law, and our agreement that ordinary common law principles are indeed “not readily transfer-rable to this action,” we see no reason why the equitable principles identified by the Supreme Court in Sberrill should not apply to this case,, whether or not it could be technically classified as an action at law.
Thus, whatever the state of the law in this area béfore Sherrill, see Oneida II, 470 U.S. at 253 n. 27, 105 S.Ct. 1245 (reserving “the question whether equitable considerations should limit the relief available” in these cases); id. at 244-45, 105 S.Ct. 1245 (deciding not to reach the question of laches because defendants had waived it), we conclude, for the above-stated reasons, that, after Sherrill, equitable defenses apply to possessory land claims of this type.
Our reading is not in conflict with the Supreme Court’s decision in Oneida Indian Nation v. County of Oneida, 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974) (“Oneida I”), where the Court specifically found federal jurisdiction to hear such pos-sessory claims, including those in ejectment. Id. at 666, 94 S.Ct. 772. The Court there noted that “the complaint in this case asserts a present right to' possession under federal law. The claim may fail at a later stage for a.variety of reasons; but for jurisdictional purposes, this is not a case where the underlying right or obligation arises only under state law and *277 federal law is merely alleged as a barrier to its effectuation.” Id. at 675, 94 S.Ct. 772. The holding of Sherrill thus addresses the question reserved in Oneida II and follows from Oneida I’s holding by providing that these possessory claims are subject to equitable defenses.
Inasmuch as the instant claim, a posses-sory land claim, is subject to the doctrine of laches; we conclude that the present case must be dismissed because the same considerations that doomed the Oneidas’ claim in Sherrill apply with equal force here. These considerations - include the following: “[generations have passed during which non-Indians have owned and developed the area that once composed the Tribe’s historic reservation,” Sherrill, 125 S.Ct. at 1483; “at least since the middle years of the 19th century, most of the [Tribe] have resided elsewhere,” id.; “the longstanding, distinctly non-Indian character of the area and its inhabitants,” id.; “the distance from 1805 to the present day,” id. at 1494; “the [Tribe’s] long delay in seeking equitable relief against New York or its local units,” id.; and “developments in [the area] spanning several generations.” Id.; see also id. at 1492-93 (“[T]his Court has recognized the impracticability of returning to Indian control land that generations earlier passed into numerous private hands.”) (citing Yankton Sioux Tribe v. United States, 272 U.S. 351, 357, 47 S.Ct. 142, 71 L.Ed. 294 (1926) (“It is impossible ... to rescind the cession and restore the Indians to their- former rights because the lands have been opened to settlement and large portions of them are now in the possession of innumerable innocent purchasers .,...”)). We thus hold that the doctrine of laches bars the possessory land claim presented by the Cayugas here.[6] The District Court, after serious consideration of this exact question, explicitly agreed with this assessment. Cayuga X, 1999 U.S. Dist. LEXIS 10579, at *86 (“Thus, even though gome delay-on the part of the Cayugas is explainable, .in the context of determining whether ejectment is an appropriate remedy, ..., the delay factor tips decidedly in favor of the defendants.”).
To summarize: the import of Sherrill is that “disruptive,” forward-looking claims, a category exemplified by possessory land claims, are subject to equitable defenses, including laches. Insofar as the Cayugas’ claim in the instant case is unquestionably a possessory land claim, it is subject to laches. The District Court found that laches barred the possessory land claim, and the considerations identified by the Supreme Court in Sherrill mandate that we affirm the District Court’s finding that the possessory land claim is barred by laches. The fact that, nineteen years into the case, at the damages stage, the District Court substituted a monetary remedy for plaintiffs’ preferred remedy of ejectment [7] cannot salvage the claim, which was- *278 subject to dismissal ah initio. To frame this point a different way: if the Cayugas filed this complaint today, exactly as worded, a District Court would be required to find the claim subject to the defense of laches under Sherrill and could dismiss on that basis.
Although we conclude that plaintiffs’ ejectment claim is barred by laches, we must also consider whether their other claims, especially their request for trespass damages in the amount of the fair rental value of the land for the entire period of plaintiffs’ dispossession, are likewise subject to dismissal. In assessing these claims, we must recognize that the trespass claim, like all of plaintiffs’ claims in this action, is predicated entirely upon plaintiffs’ possessory land claim, for the simple reason that there can be no trespass unless the Cayugas possessed the land in question. See, e.g., West 14th Street Commercial Corp. v. 5 West 14th Owners Corp., 815 F.2d 188, 195 (2d Cir.1987) (holding that a trespass cause of action must allege possession). Inasmuch as plaintiffs’ trespass claim is based on a violation of their constructive possession, it follows that plaintiffs’ inability to secure relief on their ejectment claim alleging constructive possession forecloses plaintiffs’ trespass claim. In other words, because plaintiffs are barred by laches from obtaining an order conferring possession in ejectment, no basis remains for finding such constructive possession or immediate right of possession as could support the damages claimed. Because the trespass claim, like plaintiffs’ other requests for relief, depends on the possessory land claim, a claim we have found subject to laches, we dismiss plaintiffs’ trespass claim, and plaintiffs’ other remaining claims, along with the plaintiffs’ action in ejectment.
We recognize that the United States has traditionally not been subject to the defense of laches. See United States v. Summerlin, 310 U.S. 414, 416, 60 S.Ct. 1019, 84 L.Ed. 1283 (1940). However, this does not seem to be a per se rule. See, e.g., Clearfield Trust Co. v. United States, 318 U.S. 363, 369, 63 S.Ct. 573, 87 L.Ed. 838 (1943) (holding that laches is a defense to the United States in its capacity as holder of commercial paper). Judge Pos-ner has aptly noted that “the availability of laches in at least some government suits is supported by Supreme Court decisions, notably Occidental Life Ins. Co. v. EEOC, 432 U.S. 355, 373, 97 S.Ct. 2447, 53 L.Ed.2d 402 (1977); Heckler v. Community Health Services of Crawford County, Inc., 467 U.S. 51, 60-61, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984); and Irwin v. Department of Veterans Affairs, 498 U.S. 89, 95-96, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990), that refuse to shut the door completely to the invocation of laches or estoppel (similar doctrines) in government suits.” United States v. Administrative Enterprises, Inc., 46 F.3d 670, 672-73 (7th Cir.1995). Indeed, the Seventh Circuit has made clear that, in appropriate circumstances, laches can apply to suits by the federal government. See NLRB v. P*I*E Nationwide, Inc., 894 F.2d 887, 894 (7th Cir.1990) (“Following dictum in Occidental Life and the general principle noted earlier that government suits in equity are subject to the principles of equity, laches is generally and we think correctly assumed to be applicable to suits by government agencies as well as by private parties.”) (internal citations omitted).
Notwithstanding our conclusion that the United States as plaintiff-intervenor is subject to laches in this ease, we do not purport to set forth broad guidelines for when the doctrine might apply. Rather, we follow the Seventh Circuit, which, after canvassing the case law, noted in Adminis *279 trative Enterprises that there are three main possibilities for when laches might apply against the United States: first, “that only the most egregious instances of laches can be used to abate a government suit”; second, “to confine the doctrine to suits against the government in which ... there is no statute of limitations”; and third, “to draw a line between government suits in which the government is seeking to enforce either on its own behalf or that of private parties what are in the nature of private rights, and government suits to enforce sovereign rights, and to allow lach-es as a defense in the former class of cases but not the latter.” Administrative Enterprises, 46 F.3d at 673 (internal citations omitted). We need not decide which of these three possibilities might govern because this case falls within all three. First, given the relative youth of this country, a suit based on events that occurred two hundred years ago is about as egregious an instance of laches on the part of the United States as can be imagined; second, though there is now a statute of limitations, see 28 U.S.C. § 2415(a), there was none until 1966 — i.e., until one hundred and fifty years after the cause of action accrued; and third, the United States intervened in this case to vindicate the interest of the Tribe, with whom it has a trust relationship.[8] Accordingly, we conclude that whatever the precise contours of the exception to the rule against subjecting the United States to a laches defense, this case falls within the heartland of the exception.
We acknowledge that we stated in Oneida Indian Nation v. New York, 691 F.2d 1070 (2d Cir.1982), that “[i]t is clearly established that a suit by the United States as trustee on behalf of an Indian tribe is not subject to state delay-based defenses.” Id. at 1084. That opinion, however, left open the possibility of asserting delay-based defenses founded on federal law in these circumstances. See id. (stating that “[tjhere remains the question whether a delay-based defense founded on federal law may be asserted” and concluding that because the suit was within the statute of limitations of 28 U.S.C. § 2415, the suit was timely in any case). In light of Sher-rill, which, as noted above, we read to have substantially altered the legal landscape in this area, we conclude that the federal law of laches can apply against the United States in these particular circumstances.
The Cayugas and the United States highlight the District Court’s findings, in deciding whether to award prejudgment interest, that the Cayugas were not “responsible for any delay in bringing this action” and that the “delay was not unreasonable, insofar as the actions of the Cayuga are concerned.” Cayuga Letter Br. at 3, United States Letter Br. at 3. We acknowledge these findings, but do not believe they are dispositive for our consideration of the laches question. The equitable considerations relevant to an assessment of a possessory land claim — -which is precisely what this case was from the outset — differ dramatically from the equitable considerations in a claim for prejudgment interest, which is what the case had become at the time the District Court made these findings. The District Court itself, as discussed above, found that lach-es barred the Cayugas’ preferred remedy of ejectment. Indeed, the District Court noted that “[rjegardless of when the Cay *280 ugas should have or could have commenced this lawsuit, the court cannot overlook the prejudicial consequences which the defendants would sustain if the court were to order ejectment,” and found that the “prejudice factor” was “a factor which is far too important to ignore.” Cayuga X, 1999 U.S. Dist. LEXIS 10579, at *85-86. In light of these findings, and the Supreme Court’s ruling in Sherrill, we see no need to remand to the District Court for a determination of the laches question.
Our decision to reverse the judgment of the District Court and enter judgment for defendants should in no way be interpreted as a reflection on the District Court’s efforts and rulings in this case. We recognize and applaud the thoughtful and painstaking efforts, over many years, of Judge Neil P. McCurn, who presided over this and related land claims in upstate New York with fairness and due regard to the rights and interests of all parties as well as with a keen appreciation of the complexities of the subject matter and of the relevant law. Our decision is based on a subsequent ruling by the Supreme Court, which could not be anticipated by Judge McCurn in his handling of this case over more than twenty years.
The judgment of the District Court is Reversed and judgment is entered for defendants.

. This Confederation included the Cayugas, the Oneidas, the Mohawks, the Senecas, the Onondagas, and the Tuscaroras. Cayuga Indian Nation v. Cuomo, 565 F.Supp. 1297, 1303 (N.D.N.Y.1983).

. Defendants claim that the 1838 treaty of Buffalo Creek effectively ratified these treaties. Although we ultimately need not reach this question, we note that, whatever it may do, the Treaty of Buffalo Creek neither mentions Cayuga land or Cayuga title in New York, nor refers to the 1795 or 1807 treaties. See Treaty of Jan. 15, 1838, 7 Stat. 550.

. The expert actually testified that the Cayugas owed the State approximately $7.6 million, though the State assured the Court that it would not attempt to collect from the Cayugas.

. Plaintiffs took the position in the District Court that monetary damages would not adequately compensate them for two hundred years of wrongful occupation. See Cayuga VIII, 1999 U.S. Dist. LEXIS 5228, at *5.

. We note that even though ejectment has traditionally been considered an action at law, numerous jurisdictions have recognized the applicability of equitable defenses, including laches, in an action for ejectment based on a claim of legal title or prior possession, regardless of whether damages or an order of possession was sought. See, e.g., Pankins v. Jackson, 891 S.W.2d 845, 848 (Mo.Ct.App.1995) (noting that ejectment is claim of legal right of possession, considering' whether laches “defeated'' “plaintiff's right of possession,” and concluding it did not because the delay was not the fault of plaintiff and defendants were not prejudiced); Jansen v. Clayton, 816 S.W.2d 49, 51-52 (Tenn.Ct.App.1991) (upholding dismissal of ejectment action because of laches and noting that "[a]lthough ejectment is an action at law, equitable defenses may bar purely legal claims”); McRorie v. Query, 32 N.C.App. 311, 232 S.E.2d 312, 319 (1977) ("[Plaintiffs] contend that the defense of laches is not applicable here because this is an action in ejectment. They cite no authority for this position, and we find none.”); Miller v. Siwicki, 8 Ill.2d 362, 134 N.E.2d 321, *276 323 (1956) (holding laches barred ejectment action brought after 22-year delay and specifying that laches, “even though an equitable defense, can be interposed in an ejectment action.”); Olson v. Williams, 185 Mich. 294, 151 N.W. 1043, 1044-45 (1915) (enjoining pending ejectment action because barred by laches); Loomis v. Rosenthal, 34 Or. 585, 57 P. 55, 61 (1899) (holding that plaintiffs' "lach-es [was] so gross as to preclude their recovery of the land.”).

. Sherrill effectively overruled our Court’s holding in Oneida Indian Nation v. New York, 691 F.2d 1070, 1084 (2d Cir.1982), that lach-es and other time-bar defenses should be unavailable and that "suits by tribes should be held timely if such suits would have been timely if brought by the United States." We note that in a subsequent Oneida case, Judge Newman, while writing for the Court, stated that "[t]he writer accepts the prior panel's rejection of a laches defense as the law of the case, though would find the issue to be a substantial one if it were open." Oneida Indian Nation v. New York, 860 F.2d 1145, 1149 n. 1 (2d Cir.1988).

. After finding for plaintiffs on liability and - ruling out ejectment as a remedy, the District Court seems to have folded all of the plaintiffs’ requests for relief into its award of damages, without separate consideration of any of the requests for relief. See Cayuga XI, 79 F.Supp.2d at 70. Our conclusion that the award of damages stems entirely from the ejectment claim follows from the District Court’s approach.

. Our holding here thus does not disturb our statement in United States v. Angell, 292 F.3d 333, 338 (2d Cir.2002), that "laches is not available against the federal government when it undertakes to enforce a public right or protect the public interest,” inasmuch as this case does not involve the enforcement of a public right or the protection of the public interest.