20-1310-cv
*Cayuga Nation, et al. v. Howard Tanner, et al.*

## UNITED STATES COURT OF APPEALS
### FOR THE SECOND CIRCUIT

August Term, 2020

Argued: May 25, 2021     Decided: July 27, 2021

Docket No. 20-1310-cv

CAYUGA NATION, CLINT HALFTOWN, TIMOTHY TWOGUNS, GARY WHEELER, DONALD EMERSON, MICHAEL BARRINGER, RICHARD LYNCH, B.J. RADFORD, JOHN DOES 8-20,

*Plaintiffs-Counter-Defendants-Appellees*,

— v. —

HOWARD TANNER, Village of Union Springs Code Enforcement Officer, in his official capacity, BUD SHATTUCK, Village of Union Springs Mayor, in his official capacity, CHAD HAYDEN, Village of Union Springs Attorney, in his official capacity, BOARD OF TRUSTEES OF THE VILLAGE OF UNION SPRINGS, NEW YORK, and THE VILLAGE OF UNION SPRINGS, NEW YORK,

*Defendants-Counter-Plaintiffs-Appellants*.

B e f o r e:

KEARSE, LYNCH, AND CHIN, *Circuit Judges*.

Plaintiffs-Counter-Defendants-Appellees Cayuga Nation (the "Nation") and certain of its officials brought this action against Defendants-Counter-Plaintiffs-Appellants the Village of Union Springs and certain of its officials (the "Village") seeking a declaratory judgment that, as relevant here, the Indian Gaming Regulatory Act ("IGRA") preempts the Village's ordinance regulating gambling as applied to the Nation's operation of a bingo parlor on a parcel of land located within both the Village and the Nation's federal reservation, and for corresponding injunctive relief. The United States District Court for the Northern District of New York (Hurd, *J.*) granted summary judgment to the Nation. We agree with the district court that neither issue nor claim preclusion bars this suit and that IGRA preempts contrary Village law because the parcel of land at issue sits on "Indian lands" within the meaning of that Act.

We therefore **AFFIRM** the judgment of the district court, without reaching the Nation's alternate theories of immunity.

————————

DAVID W. DEBRUIN (Zachary C. Schauf, *on the brief*), Jenner & Block LLP, New York, NY, *for Plaintiffs-Counter-Defendants-Appellees.*

DAVID H. TENNANT, The Law Office of David Tennant PLLC, Rochester, NY, *for Defendants-Counter-Plaintiffs-Appellants.*

————————

GERARD E. LYNCH, *Circuit Judge*:

This case marks the latest installment of a decades-long dispute between the Cayuga Nation (the "Nation"), a federally recognized Indian tribe, and the Village of Union Springs, New York (the "Village"), concerning the Nation's ownership and use of a parcel of land located at 271 Cayuga Street (the "Parcel"),

2

which sits within the bounds of both the Village and the Cayugas' historic reservation. In 2003, the Nation sued the Village seeking declaratory and injunctive relief on the theory that the reunification of the Nation's aboriginal title to the Parcel with the fee title revived the Nation's sovereignty over it so as to preclude the Village's application of its laws to regulate construction occurring there. After initially obtaining a judgment in its favor and while the Village's appeal of that judgment was pending before this Court, the Nation opened a gambling parlor, Lakeside Entertainment ("Lakeside"), on the Parcel. Thereafter, however, we remanded the case to the district court in light of the Supreme Court's decision in *City of Sherrill v. Oneida Indian Nation*, 544 U.S. 197, 221 (2005), which had been decided while the Village's appeal was pending. On remand, the district court vacated its prior judgment, entered judgment for the Village, and dismissed the Nation's complaint. Following that judgment, the Nation shuttered Lakeside.

At least for a time. In July 2013, much to the Village's chagrin (and in apparent violation of its gambling laws), Lakeside reopened for business, precipitating another round of litigation. Again, the Nation seeks to preclude the application of Village law, but on a different, and narrower, basis than before.

Rather than claiming broad immunity based on its assertion of inherent sovereignty, the Nation now argues that Indian Gaming Regulatory Act ("IGRA") preempts the Village's anti-gambling laws. The Village contends that, in light of the prior litigation, preclusion doctrines bar the federal courts from considering the Nation's latest theory and that, in any case, IGRA does not apply to the Parcel because it does not qualify as "Indian lands," which IGRA defines as "all lands within the limits of any Indian reservation." 25 U.S.C. § 2703(4)(A).

After considering the parties' cross-motions for summary judgment, the United States District Court for the Northern District of New York (David N. Hurd, *J.*) agreed with the Nation. So do we. We therefore affirm the judgment of the district court.

## BACKGROUND

The history of relations between and among the federal and state governments (and their respective predecessors) and the indigenous peoples of North America, and the changing legal regimes that have governed those relations, is far too complex and lengthy a topic to be described in detail within the confines of a single judicial opinion. Nevertheless, because it is difficult to understand the issues presented in this appeal without at least some appreciation

4

of the context underlying the dispute, we begin with a brief, and necessarily incomplete, recitation of that history, drawing primarily from statutory history as well as prior decisions of the Supreme Court and of this Court. We then turn to the operative facts of this case, as established in the summary judgment record.

## A.    *Historical Background*

Prior to European settlement of North America, the Nation, one of the six tribes of the Haudenosaunee Confederacy (also known as the Iroquois Nations),[1] lived on lands now comprising, *inter alia*, central New York. In February 1789, weeks before government under the Constitution began, members of the Nation entered into a treaty with New York whereby the Nation ceded all of its land to the State save for approximately 64,000 acres (the "Cayuga Reservation"). *See Cayuga Indian Nation of N.Y. v. Pataki*, 413 F.3d 266, 268 (2d Cir. 2005). In 1794, amidst rising federal concern over the potential for rekindled hostilities between the Haudenosaunee Confederacy and the young United States, the federal government and the Confederacy concluded the Treaty of Canandaigua; as is relevant here, that treaty formally recognized the Cayuga Reservation and

---

[1] The others being the Oneidas, the Mohawks, the Senecas, the Onondagas, and, as of the early 18th century, the Tuscaroras. *See Cayuga Indian Nation of N.Y. v. Pataki*, 413 F.3d 266, 268-69 n.1 (2d Cir. 2005).

provided that "the United States will never claim the same, nor disturb them or either of the Six Nations . . . in the free use and enjoyment thereof." Acts of Nov. 11, 1794, art. II, 7 Stat. 44,. The federal government today recognizes the Nation as the same entity with which it concluded the Treaty of Canandaigua.

The promises in the Treaty of Canandaigua were backed up, at least in theory, by the provisions of the Indian Trade and Intercourse Act, commonly referred to as the Nonintercourse Act. Passed in 1790 pursuant to Congress's authority under the Indian Commerce Clause of the Constitution, the Nonintercourse Act provided that "no sale of lands made by any Indians, or any nation or tribe of Indians within the United States, shall be valid to any person or persons, or to any state . . . unless the same shall be made and duly executed at some public treaty, held under the authority of the United States." Acts of July 22, 1790, ch. 33, § 4, 1 Stat. 137, 138.[2] Despite these statutory protections for native lands, however, New York purchased the entirety of the Cayuga Reservation in

---

[2] The Nonintercourse Act remains on the books today. Amended over the course of the Nation's history, its present iteration states, in relevant part, that "[n]o purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution." 25 U.S.C. § 177

two transactions conducted in 1795 and 1807. *See Pataki*, 413 F.3d at 269. The

United States neither ratified nor interfered with these transactions. *See id.* As is

important for present purposes, however, the Village concedes that no Act of

Congress has disestablished the Cayuga Reservation in the intervening centuries.

*See, e.g.*, *McGirt v. Oklahoma*, 140 S. Ct. 2452, 2462 (2020) ("To determine whether a

tribe continues to hold a reservation, there is only one place we may look: the

Acts of Congress.").

The Nonintercourse Act and the Treaty of Canandaigua were

representative of federal Indian policy in the early days of the United States,

commonly referred to as the "treaty era." In broad terms, the treaty era was

characterized by the establishment of treaties whereby a tribe would cede much

of its territory while retaining a small reservation over which the tribe would, at

least in theory, be permitted to exercise sovereignty without state interference.

*See generally* F. Cohen, Handbook of Federal Indian Law § 1.03 (2012)

("Handbook").[3] That policy persisted until the latter half of the 19th century and

---

[3] Though the overarching policy of forming treaties with tribes to establish
reservations persisted until at least the end of the Civil War, beginning in the first
half of the 19th Century, national expansion led to an increased use of the treaty
process to remove eastern and southern tribes onto newly created western
reservations. The best known example of this practice was the forcible removal of

7

formally came to an end with the passage of the Indian Appropriations Act of 1871. Acts of Mar. 3, 1871, ch. 120, 16 Stat. 544. That act, though affirming then-existing treaty obligations, provided that "[n]o Indian nation or tribe within the territory of the United States shall be acknowledged or recognized as an independent nation, tribe, or power with whom the United States may contract by treaty." *Id.* at 566, codified at 25 U.S.C. § 71.

The conclusion of the treaty era marked the beginning of the allotment era, which saw a shift in federal policy from forced segregation to forced assimilation of Native Americans, culminating in the passage of the General Allotment Act of 1887, commonly referred to as the Dawes Act after its sponsor, then-Senator Henry Dawes of Massachusetts. Acts of Feb. 8, 1887, ch. 119, 24 Stat. 388; *see also* Handbook § 1.04. The Dawes Act was intended to facilitate "the eventual assimilation of the Indian population and the gradual extinction of Indian reservations and Indian titles." *Montana v. United States*, 450 U.S. 544, 559 n.9

members of Cherokees, Muscogee, Seminole, Chickasaw, and Choctaw tribes to land in modern-day Oklahoma. Some Cayugas who left New York with members of other Iroquois tribes following the Treaty of Canandaigua and subsequent transactions with New York were ultimately removed to Oklahoma as well; today, they comprise part of the federally recognized Seneca-Cayuga Tribe of Oklahoma. *See Cayuga Indian Nation of N.Y. v. Carey*, No. 80-cv-930, 1981 WL 380694, at *2-4 (N.D.N.Y. Nov. 9, 1981).

(1981) (cleaned up). To that end, the Dawes Act authorized the President to divide existing reservation lands into "allotments" for individual tribal members, "whenever in his opinion any reservation or any part thereof of such Indians is advantageous for agricultural and grazing purposes." Dawes Act § 1, 24 Stat. at 388. The allotments were to be held in trust for allottees by the United States for 25 years, after which alienable title would be conveyed to the allottees in fee simple. Dawes Act § 5, 24 Stat. at 389; *see also United States v. Pelican*, 232 U.S. 442, 446 (1914). The Dawes Act also permitted reservation land not allotted to tribal members to be sold to the federal government, which, in turn would sell the land to non-Indian settlers. Dawes Act § 5, 24 Stat. 389-90.

In 1906, Congress amended the Dawes Act to permit the Secretary of the Interior to "at any time . . . cause to be issued to [an] allottee a patent in fee simple, and thereafter all restrictions as to sale, incumbrance, or taxation of said land shall be removed." Acts of May 8, 1906, ch. 2348, 34 Stat. 183. Thereafter, Congress passed a series of acts concerning the allotment and division of surplus lands on individual reservations. *See, e.g.*, *Solem v. Bartlett*, 465 U.S. 463, 469-70 n.10 (1984) (discussing specific surplus lands acts). The net effect of these efforts was to reduce tribal land holdings from approximately 156 million acres in 1881

to 48 million acres in 1934. *See* Handbook § 1.04; *see also Hodel v. Irving*, 481 U.S. 704, 706-09 (1987) (recounting history of allotment era and resultant harm to tribal land interests).

The most recent shift in federal policy towards Native Americans came with the passage of the Indian Reorganization Act ("IRA") in 1934, which marked the formal end of the allotment era. *See* Pub. L. No. 73-383, ch. 576, 48 Stat. 984, codified as amended at 25 U.S.C. § 5101 *et seq.* "The intent and purpose of the Reorganization Act was 'to rehabilitate the Indian's economic life and to give him a chance to develop the initiative destroyed by a century of oppression and paternalism.'" *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 152 (1973), quoting H.R. Rep. No. 1804, 73d Cong., 2d Sess. 6 (1934). Among its many provisions, the IRA prohibited future allotments, restored surplus lands to tribal ownership, authorized the purchase (or repurchase) of land within or without the borders of existing reservations to be held in trust by the federal government for the benefit of tribes and the creation of new reservations, exempted tribal trust land from state and local taxation, and restored tribal sovereignty. *See generally* IRA §§ 1-19, codified as amended at 21 U.S.C. § 5101-5110. Though the IRA has been amended and supplemented in the years since its enactment, federal-state-tribal relations

10

continue to operate under its broad framework.

Following the passage of the IRA and the quasi-restoration of the reservation system, the issue of whether and to what extent allotment-era policies had worked to diminish reservations established by treaty was a frequent topic of litigation. The Supreme Court, while acknowledging that the allotment-era Congress "anticipated the imminent demise of the reservation and, in fact, passed the [surplus lands] [a]cts partially to facilitate that process" and, accordingly, had "failed to be meticulous in clarifying whether a particular piece of legislation formally sliced a certain parcel of land off [a] reservation," nonetheless has held that the division and allotment of tribal lands did not by itself terminate existing treaty reservations. *Solem*, 465 U.S. at 468-69.

Instead, the Court has held that, because only Congress holds the power to establish and terminate reservations, "[o]nce a block of land is set aside for an Indian reservation and no matter what happens to the title of individual plots within the area, the entire block retains its reservation status until Congress explicitly indicates otherwise." *Id.* at 470, citing *United States v. Celestine*, 215 U.S. 278, 285 (1909). Accordingly, treaty reservations persist unless Congress "clearly evince[s] an intent to change [their] boundaries" through legislation. *Id.* (citation

11

and internal quotation marks omitted); *compare also, e.g.*, *Mattz v. Arnett*, 412 U.S. 481, 506 (1973) (1892 act opening Klamath River Reservation to settlement under Homestead Act did not disestablish reservation) *with, e.g.*, *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 597-98 (1977) (language in 1904 act providing that Rosebud Sioux Tribe "do hereby cede, surrender, grant, and convey to the United States all their claim, right, title, and interest in and to all that part of the Rosebud Indian Reservation now remaining unallotted" disestablished reservation). Or, as the Court put it more recently, "[i]f Congress wishes to break the promise of a reservation, it must say so." *McGirt*, 140 S. Ct. at 2462. Accordingly, many reservations persist today notwithstanding that much of the land within them has long since left tribal hands; for example, much of northeastern Oklahoma, including most of the City of Tulsa, remains the Creek reservation, though nearly all of the land comprising it is owned by non-Indians. *See id.*

Separately, as will become relevant in this case, in the wake of the Supreme Court's decision in *Bryan v. Itasca Cty.*, 426 U.S. 373 (1976), in which the Court reaffirmed that states generally lack authority to regulate Native Americans on reservation land, tribes began experimenting with gambling facilities as a means of generating revenue. *See* Handbook § 12.01. By the 1980s, tribal gaming had

12

become both a significant source of revenue for many tribes and a considerable source of tension between tribes running gambling operations and the governments of the states in which their reservations were located. *See id.* Against that backdrop, Congress enacted IGRA in 1988 "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." Pub. L. No. 100-497, § 3, 102 Stat. 2467, codified at 25 U.S.C. § 2702(1). IGRA preempts all state and local regulatory authority over certain classes of gambling conducted on "Indian lands," defined, in relevant part, as "all lands within the limits of any Indian reservation." 25 U.S.C. § 2703(4)(A). Most importantly for the present case, IGRA's regulatory and preemption scheme extends to the type of electronic bingo that the Nation offers customers at Lakeside, which falls within the statutory category of class II gaming.[4] *See id.* § 2703(7) (defining "class II

---

[4] "IGRA divides gaming into three classes, subjecting the classes to varying degrees of regulatory control." *United States v. Cook*, 922 F.2d 1026, 1033 (2d Cir. 1991). Class II gaming includes, in relevant part, "the game of chance commonly known as bingo (whether or not electronic, computer, or other technologic aids are used in connection therewith) . . . including (if played in the same location) pull-tabs, lotto, punch boards, tip jars, instant bingo, and other games similar to bingo." 25 U.S.C. § 2703(7)(A). Contemporary electronic bingo machines such as those featured at Lakeside, outwardly resemble slot machines (which fall within the more stringently regulated category of class III gaming, *see id.* §§ 7(B), 8) but

gaming"); § 2710(a)(2) ("Any class II gaming on Indian lands shall continue to be within the jurisdiction of the Indian tribes, but shall be subject to the provisions of this chapter."). In short, the tribes decide whether to undertake class II gaming, subject to regulation by the federal government, not the states.

B.      *Prior Litigation and The* Sherrill *Decision*

Perhaps because the affected tribes were dispossessed of their lands long before allotment even began, no allotment era legislation (nor any legislation passed since) disestablished the Cayuga Reservation or any of the other reservations established through the Treaty of Canandaigua, including the Oneida Nation's reservation (the lands comprising which New York State acquired in the early 19th century, again without federal ratification). *See Oneida Indian Nation v. Oneida Cty.*, 719 F.3d 525, 528-29 (2d Cir. 1983). Accordingly, beginning in the 1970s, the Cayuga and Oneida Nations (along with other tribes, discussion of which we omit) filed a series of cases in federal court seeking various remedies under the theory that the transactions through which New

---

determine results differently from standard slot machines. *See generally, e.g.,* *United States v. 162 MegaMania Gambling Devices*, 231 F.3d 713 (10th Cir. 2000) (examining similar class II gaming device and holding that it was not class III slot machine).

14

York acquired their respective reservations were void *ab initio* because they violated the Nonintercourse Act. The Oneida Nation first pursued – and ultimately succeeded on – a fairly narrow claim for damages in the form of fair-market rental value for the land comprising its reservation for the two years prior to the initiation of its action. That dispute wound up before the Supreme Court twice. In its first decision, the Court reversed the district court's dismissal for lack of federal jurisdiction. *See Oneida Indian Nation v. Oneida Cty.*, 414 U.S. 661, 665 (1974). In its second decision, the Court affirmed that the Oneida Nation could pursue a claim for wrongful dispossession while leaving open "[t]he question [of] whether equitable considerations should limit the relief available to the present day Oneida Indians." *Oneida Cty. v. Oneida Indian Nation*, 470 U.S. 226, 253 n.27 (1985).[5]

Building on this early success, the Oneida Nation pursued another strategy

---

[5] The Cayuga Nation filed a separate action seeking considerably broader relief including, *inter alia*, a declaration of its ownership rights over the Cayuga Reservation, ejectment, and trespass damages in the form of fair rental value from the time of the Nation's dispossession through the date of judgment. *See Cayuga Indian Nation of N.Y. v. Cuomo*, 565 F. Supp. 1297, 1306 (N.D.N.Y. 1983). That action remained pending for over two decades and was ultimately resolved in the State's favor following the Supreme Court's decision in *Sherrill*, discussed *infra*. *See Pataki*, 413 F.3d at 268.

15

to reassert its rights over its historic reservation: purchasing land within the reservation's bounds in open market transactions. The Oneida Nation then refused to pay local property taxes levied on the properties it had purchased on the theory that its repurchase of the properties had unified the fee titles to the properties with the Oneida Nation's aboriginal title and thus worked a restoration of its sovereignty to the exclusion of local regulation. In February 2000, the Oneida Nation sued the City of Sherrill, which was attempting to evict the Oneida Nation from one such property for unpaid taxes, in the Northern District of New York. The Oneida Nation sought a declaration that the parcel in question qualified as "Indian country" within the meaning of the Major Crimes Act, 18 U.S.C. § 1151 *et seq.* (the "MCA"), and was thus exempt from state and local taxation.[6] *See Oneida Indian Nation of N.Y. v. City of Sherrill*, 145 F. Supp. 2d

---

[6] The MCA defines Indian country as, in relevant part, "all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation." 18 U.S.C. § 1151. Although the MCA itself governs the prosecution of certain crimes committed in Indian country, the Supreme Court has recognized that its definition of Indian country "generally applies as well to questions of civil jurisdiction." *DeCoteau v. District Cty. Ct. for Tenth Judicial Dist.*, 420 U.S. 425, 427 n.2 (1975) (citations omitted). Accordingly, it has long been the rule that tribal land in Indian country is not subject to state or local taxation. *See, e.g., Oklahoma Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 458 (1995) (collecting cases).

16

226, 237 (N.D.N.Y. 2001). That case (along with other related cases with which it was consolidated) was assigned to Judge Hurd, who, in 2001, entered judgment for the Oneida Nation on the tax immunity claim. *Id.* at 267-68. In 2003, a divided panel of this Court affirmed that judgment. *See Oneida Indian Nation of N.Y. v. City of Sherrill*, 337 F.3d 139, 145-46 (2d Cir. 2003). The City of Sherrill petitioned the Supreme Court for a writ of certiorari, which the Court granted in June 2004. *City of Sherrill, N.Y. v. Oneida Indian Nation of N.Y.*, 542 U.S. 936 (2004) (granting petition for writ).

While that case was wending its way through the judicial system, the Cayuga Nation pursued similar efforts, which we recount in greater detail. Beginning in 2002, the Nation began purchasing properties within the bounds of the Cayuga Reservation in open-market transactions. In April 2003, the Nation purchased the Parcel, which had most recently been used as an auto parts store. In early October 2003, the Cayugas appointed a tribal code officer and began construction on the Parcel; the Nation did not consult the Village or otherwise engage in the ordinary permitting process established by state and local law before beginning construction. Soon after the Nation began construction, the Village issued a series of stop work orders citing the lack of required permits. The

last such order was dated October 15, 2003.

On October 19, 2003, the Nation sued the Village, the Town of Springport, and the County of Cayuga in the Northern District of New York. *See* Complaint, *Cayuga Indian Nation of N.Y. v. Vill. of Union Springs*, No. 03-cv-1270 (N.D.N.Y. Oct. 19, 2003), ECF No. 1 (the "2003 Complaint" and "2003 Litigation"). The 2003 Complaint sought a declaration that the Village's attempts to regulate the Nation's activity on the Parcel "violate the 1794 Treaty of Canandaigua; the Nation's sovereignty, which derives from Article I, Section 8 and Article II, Section 2, Clause 2 of the United States Constitution and from federal common law, and the Nonintercourse Act (25 U.S.C. § 177); and 25 C.F.R. 1.4" *id.* ¶ 32, and an injunction against future enforcement actions. That complaint did not reference IGRA or any plans to conduct gambling on the Parcel. In its answer and counterclaim, the Village alleged that "the Village Clerk received an anonymous telephone call indicating that the Nation was planning on opening a gaming operation on the [Parcel]." 2003 Litigation, ECF No. 9 ¶ 86. The case was assigned to Judge Hurd, who had also presided over the Oneida Nation's tax immunity case.

On November 12, 2003, the Nation adopted a class II gaming ordinance, a

18

prerequisite for tribes seeking to operate class II gaming facilities on Indian land

under IGRA. *See* 25 U.S.C. § 2710(b)(1)(B). Six days later, the National Indian

Gaming Commission ("NIGC"), the agency within the Department of the Interior

that regulates IGRA gambling, approved the Nation's gaming ordinance. On

December 11, 2003, the Nation moved for summary judgment. The following

month, the NIGC's acting general counsel sent a letter to the Village's then-

Mayor advising him that the NIGC had approved the Nation's gaming

ordinance.

On February 10, 2004, the Village cross-moved for summary judgment in

that action or, in the alternative, for a preliminary injunction barring the Nation

from operating a class II gaming facility on the Parcel until the Nation had

complied with IGRA. The Village also argued that, assuming it could not

generally regulate the Parcel without infringing upon the Nation's sovereignty,

the Parcel's proximity to a school coupled with the Nation's apparent plans to

open a gaming facility thereon constituted exceptional circumstances justifying

the application of local law.[7] This marked the first appearance of IGRA in the

---

[7] Though states broadly lack authority to regulate the activity of tribal members
on reservation lands, the Supreme Court has held that "in exceptional
circumstances a State may assert jurisdiction over the on-reservation activities of

2003 Litigation. The Nation argued in opposition that the Village had no standing to seek relief under IGRA and that exceptional circumstances did not exist because IGRA provides a comprehensive federal regulatory scheme that would govern any gaming that might occur on the Parcel.

On April 27, 2004, the district court granted summary judgment to the Nation, reasoning that the Parcel qualified as "Indian country" within the meaning of the MCA and, accordingly, was exempt from state jurisdiction. *See Cayuga Indian Nation of N.Y. v. Vill. of Union Springs*, 317 F. Supp. 2d 128 (N.D.N.Y. 2004) ("*Union Springs I*"). The district court further agreed that the Parcel's proximity to a school was not an exceptional circumstance because "[t]he Nation correctly points out that it is governed by IGRA, which preempts state and local attempts to regulate gaming on Indian lands and thus, such a consideration is irrelevant here." *Id.* at 148. The district court further denied the Village's motion for a preliminary injunction because it had not made the requisite showing of irreparable harm. *Id.* at 149-50.

On May 31, 2004, while the Village's appeal of that decision was pending,

_____

tribal members." *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 331-32 (1983), citing *Puyallup Tribe v. Washington Game Dept.*, 433 U.S. 165 (1977).

the Nation opened Lakeside and began conducting class II gaming on the Parcel. The NIGC exercised its authority to regulate gaming at Lakeside, conducting regular site visits and requiring the payment of quarterly fees.

On March 29, 2005, however, the Supreme Court reversed this court's decision in the Oneida Nation's tax immunity case. *See Sherrill* 544 U.S. at 221. Though the Court did not disturb the conclusion that the Oneida Nation's reservation qualified as Indian country within the meaning of the MCA, it concluded that permitting the Oneida Nation to revive "present and future Indian sovereign control, even over land purchased at market price, would have disruptive practical consequences." *Id.* at 219. Accordingly, the Court held that the tribe's "long delay in seeking equitable relief against New York or its local units . . . evoke[d] the doctrines of laches, acquiescence, and impossibility, and render[ed] inequitable the piecemeal shift in governance [that] suit [sought] unilaterally to initiate." *Id.* at 221.[8]

---

[8] In dictum, the Court observed that "Congress has provided a mechanism for the acquisition of lands for tribal communities that takes account of the interests of others with stakes in the area's governance and well being. Title 25 U.S.C. § 465 authorizes the Secretary of the Interior to acquire land in trust for Indians and provides that the land 'shall be exempt from State and local taxation.'" *Id.* at 220, quoting *Cass Cty. v. Leech Lake Band of Chippewa Indians*, 524 U.S. 103, 114-15 (1988). Perhaps stimulated by this dictum, weeks after *Sherrill* was decided, the

Thereafter, we remanded the Village's still-pending appeal of *Union Springs I* for reconsideration in light of *Sherrill*. The Village did not invoke IGRA in its brief on remand and instead took the position that, under *Sherrill*, it was entitled to apply its laws to all activities on the Parcel. The Nation endeavored to distinguish *Sherrill* but did not invoke IGRA except to emphasize that it had not brought a claim under IGRA, that it was not seeking relief under IGRA, and that no IGRA-related issues were before the district court. The Nation also did not make any arguments specifically related to Lakeside or to gambling. Ultimately, the district court concluded that the Nation's efforts to preclude the application of zoning and other local land use laws was "even more disruptive" than the Oneida Nation's efforts to avoid the payment of local taxes and, accordingly, vacated the prior judgment entered for the Nation and entered judgment for the Village. *Cayuga Indian Nation of N.Y. v. Vill. of Union Springs*, 390 F. Supp. 2d 203, 206 (N.D.N.Y. 2005) ("*Union Springs II*"). The Nation did not appeal, and Lakeside shut its doors.

---

Nation applied to the Department of the Interior to have the Parcel and other lands within its reservation taken into trust. The Department ultimately denied the application in July 2020. *See* July 31, 2020 Letter from Tara Sweeney to Clint Halftown, Dkt. No. 75.

22

*B. Subsequent Developments and The Proceedings Below*

Some years later, the Nation determined that it was time to try its hand at gaming again. On May 30, 2013, the Nation informed the NIGC that it had renewed Lakeside's class II gaming license and, in accordance with NIGC regulations, provided the agency with various environmental, public health, and safety attestations as well as background check materials on various employees. On July 3, 2013, Lakeside re-opened for business. That same day, the Nation, through its counsel, wrote to various state and local officials advising them of Lakeside's reopening and of the Nation's position that the class II gaming that the Nation would offer at Lakeside was governed by IGRA to the exclusion of state and local regulation because Lakeside sat on "Indian land" as defined therein.

Six days later, the Village issued the Nation an order to remedy zoning violations premised on the Nation's operation of a bingo facility without a Village-issued license in violation of a 1958 games of chance ordinance (the "1958 Ordinance"). On August 8, the Nation wrote Defendant-Appellant Howard Tanner, Union Springs' zoning officer, requesting the issuance of a certificate of occupancy. Tanner responded by letter seeking additional information and

23

advising that the 1958 Ordinance required the Nation to seek a license to run a bingo operation. The Nation submitted a new application for a certificate of occupancy that addressed the issues that Tanner had identified save for the alleged violation of the 1958 Ordinance the following December. Four days after that, the Village served additional orders to remedy citing the Nation's lack of a certificate of occupancy authorizing a change in use of the Parcel and the Nation's purported violation of the 1958 Ordinance.

On February 21, 2014, Tanner visited Lakeside and identified three building code issues. The Nation addressed the identified issues, and on a March 7 return visit, Tanner advised representatives of the Nation that Lakeside met code standards for fire/life safety. On March 24, however, Tanner sent a letter advising the Nation that he could not issue a certificate of occupancy for Lakeside because it was in violation of the 1958 Ordinance and because the Nation had not obtained a use variance. Shortly thereafter, the Nation, through counsel, responded by letter setting forth its position that it need not obtain a use variance under local zoning law and, in any event, to the extent that the Village believed that the use variance was required under the 1958 Ordinance, IGRA preempted that requirement. On October 27, the Village advised the Nation of its

intent to take enforcement action against Lakeside and Nation officials.

The next day, the Nation and its officials (then styled as John Doe Plaintiffs) brought this action against the Village, its board, and various Village officials in the Northern District of New York, where the matter was assigned to Judge Hurd. The Nation sought a declaration that: (1) the 1958 Ordinance is preempted by IGRA, (2) even if the 1958 Ordinance itself is not preempted by IGRA, IGRA's criminal enforcement provisions vest the federal government with exclusive jurisdiction to enforce the 1958 Ordinance, and (3) any civil action against the Nation or its officials to force compliance with the 1958 Ordinance would be barred by sovereign immunity. The Nation also sought injunctive relief precluding the Village from taking further action against it or its officials. Soon after filing the complaint, the Nation sought and obtained a temporary restraining order, which the parties extended by joint stipulation throughout the course of the action.[9]

---

[9] Early on in the litigation, The Cayuga National Unity Council, which claims to be the legitimate leadership of the Nation, moved to intervene and have the suit dismissed. Although the Council was denied leave to intervene, the district court granted the Village's early motion to dismiss, reasoning that the Nation's standing to sue on behalf of the tribe was intertwined with questions of tribal law that the federal courts lacked jurisdiction to resolve. *Cayuga Nation v. Tanner*, No. 14-cv-1317, 2015 WL 2381301, at *3-4 (N.D.N.Y. May 19, 2015). The district court

While the action was pending, the Nation continued to expand its footprint in the Cayuga Reservation. In 2018, the Nation promulgated a penal code, created a police force and court system to enforce it, and contracted for a prison to incarcerate those convicted of violating it. In a 2019 letter, the director of the Bureau of Indian Affairs affirmed the federal government's position that the Nation was entitled to enforce its penal code against Native Americans within the boundaries of the Cayuga Reservation because the Reservation constituted "Indian country" under the MCA. That same year, the chairman of the NIGC determined that the NIGC would again regulate gaming at Lakeside; since then, the NIGC has conducted regular site visits and has accepted the Nation's payment of quarterly fees pursuant to IGRA and its implementing regulations.

On May 22, 2019, the Nation amended its complaint; the amended complaint identified named tribal officials as Plaintiffs and alleged facts

_____

also held that the individual plaintiffs – who at that point were still styled as John Does – also lacked standing because they had failed to plead a credible threat of imminent prosecution. *Id.* at *5 n.8. On appeal, we reversed that dismissal, reasoning that it was appropriate to defer to the Bureau of Indian Affair's decision to recognize Clint Halftown, who brought both this suit and the 2003 Litigation on behalf of the tribe, as the Nation's authorized representative. *See Cayuga Nation v. Tanner*, 824 F.3d 321, 328 (2d Cir. 2016). We further concluded that the individual plaintiffs had satisfied the low threshold to bring a pre-enforcement challenge. *Id.* at 330-33.

occurring since the Nation filed suit in 2014 but sought no additional relief. On September 4, the parties cross-moved for summary judgment. On March 24, 2020, the district court granted summary judgment to the Nation. *Cayuga Nation v. Tanner*, 448 F. Supp. 3d 217 (N.D.N.Y. 2020). The district court rejected the Village's argument that issue and claim preclusion barred the Nation's suit and, on the merits, concluded that the Parcel qualified as "Indian lands" under IGRA, thus preempting the 1958 Ordinance and divesting the Village of jurisdiction to regulate gaming thereon. The district court further agreed that IGRA's criminal enforcement provisions separately divested the Village of jurisdiction to enforce the 1958 Ordinance and that the Nation enjoyed sovereign immunity from any civil suit to enforce the 1958 Ordinance. This appeal followed.

## DISCUSSION

We review a grant of summary judgment de novo. *See, e.g.*, *Mitchell v. City of New York*, 841 F.3d 72, 77 (2d Cir. 2016). Ordinarily, "[w]here cross-motions for summary judgment are filed, a court must evaluate each party's own motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Hotel Employees & Rest. Employees Union, Local 100 of N.Y. v. City of N.Y. Dep't of Parks & Recreation*, 311

27

F.3d 534, 543 (2d Cir. 2002) (internal quotation marks omitted). In this case, however, the parties have stipulated to the operative facts; they disagree only as to the proper application of specific legal doctrines to those facts, namely the applicability of claim/issue preclusion and the appropriate construction of IGRA, which are issues that we review de novo. *See, e.g.*, *Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 218 (2d Cir. 2014) ("Our review of a district court's interpretation of a statute, a pure question of law, is . . . de novo."); *Uzdavines v. Weeks Marine, Inc.*, 418 F.3d 138, 143 (2d Cir. 2005) (applicability of estoppel doctrines presents pure question of law reviewed de novo).

For the reasons discussed herein, we agree with the district court that neither claim nor issue preclusion bars this action and that the Parcel sits on "Indian lands" within the meaning of IGRA. We therefore affirm the judgment of the district court.

## I.     Preclusion Doctrines

The Village asserts, as threshold defenses, both issue and claim preclusion, contending that IGRA preemption was actually litigated in 2003 or, in the alternative, that the Nation was required to litigate it then and cannot do so now. Like the district court, we disagree.

28

*A.*    *Issue Preclusion*

Issue preclusion, also referred to as collateral estoppel, bars "successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to [a] prior judgment." *New Hampshire v. Maine*, 532 U.S. 742, 748-49 (2001). "The preclusive effect of a federal-court judgment is determined by federal common law." *Taylor v. Sturgell*, 553 U.S. 880, 891 (2008). A party may invoke issue preclusion only if: "(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party [raising the issue] had a full and fair opportunity to litigate the issue [in the prior proceeding]; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 288-89 (2d Cir. 2002) (citation and internal quotation marks omitted).

To support its argument that IGRA preemption was both litigated and decided in the prior action, the Village points to an isolated passage of *Union Springs I* in which, holding that the Parcel's proximity to a school was not an exceptional circumstance justifying the application of local law, the district court observed that "[t]he Nation correctly points out that it is governed by IGRA,

29

which preempts state and local attempts to regulate gaming on Indian lands, and, thus, such a consideration is irrelevant here." 317 F. Supp. 2d at 148. As the Village tells it, that passage demonstrates that "the district court's 2004 opinion relied on the Cayugas' articulation of IGRA preemption as blocking state and local laws," Appellants' Br. at 29, and that, therefore, *Union Springs II*, which resolved the 2003 Litigation in the Village's favor, implicitly resolved the issue of IGRA preemption in its favor as well.

But the district court's passing reference to IGRA in *Union Springs I* did not decide whether IGRA preempted any specific local law. Indeed, there was no need for it to do so. The 2003 Litigation arose out of the Nation's claim of tribal immunity from the Village's jurisdiction to enforce its zoning laws, and the district court ruled for the Nation on that issue. The Nation had not begun gaming, the Village had not invoked the 1958 Ordinance, and the Nation did not premise its immunity claim on preemption.

Further, even assuming, *arguendo*, that *Union Springs I* actually had decided IGRA preemption, that judgment was later vacated, and "[a] judgment vacated or set aside has no preclusive effect." *Stone v. Williams*, 970 F.2d 1043, 1054 (2d Cir. 1992). And the final order and judgment that did emerge from the 2003 Litigation

30

– *Union Springs II* – does not even mention IGRA. Notwithstanding, the Village posits that, since *Union Springs II* was decided in its favor, the IGRA issue was decided in its favor as well because the Nation "waive[d] and abandon[ed] . . . the IGRA preemption argument" by failing to assert it at that stage of the litigation. Appellants' Br. at 30. But that argument strains credulity.

True, the Nation affirmatively invoked IGRA during the 2003 Litigation; it did so, however, in response to the "exceptional circumstances" argument that the Village raised in support of its summary judgment motion. The Nation's argument was premised on the mere existence of IGRA's comprehensive regulatory scheme as opposed to the scope of any of its specific provisions. On remand after *Sherrill*, the Village, buoyed by a favorable change of law, abandoned the exceptional circumstances argument altogether; there was, indeed, no reason for the Village to invoke it, nor, therefore, for the Nation to pursue its response to that point. The district court, limiting itself to the claims made by the Nation and the arguments advanced by both sides, held that, under *Sherrill*, the Nation could not invoke its inherent sovereignty to claim immunity from local zoning and land use laws. *Union Springs II*, 390 F. Supp. 2d at 206. Nothing about that simple holding implicates IGRA.

Of course, issue preclusion extends not only to issues that are expressly decided but also to those issues that are "by necessary implication adjudicated in the prior litigation." *Rezzonico v. H&R Block, Inc.*, 182 F.3d 144, 148 (2d Cir. 1999). But the Village cites no authority for the novel proposition that a judgment can be deemed to have implicitly resolved an issue that was not the basis of, or otherwise intertwined with, any claim that was actually asserted in the underlying litigation. To the contrary, "[i]t is well established that although an issue was fully litigated and a finding on the issue was made in the prior litigation, the prior judgment will not foreclose reconsideration of the same issue if that issue was not necessary to the rendering of the prior judgment." *Halpern v. Schwartz*, 426 F.2d 102, 105 (2d Cir. 1970). The 2003 Litigation was resolved on the straightforward holding that *Sherrill* defeated the Nation's claims of sovereignty. Thus, no IGRA ruling was "necessary to the rendering of [that] judgment," *id.*, such that issue preclusion would not bar its relitigation in this case even if *Union Springs II* had decided it which, as discussed, it did not.

By any measure, thus, the Village's assertion of issue preclusion fails.

B.     *Claim Preclusion*

The Village argues in the alternative that, even if the issue of IGRA

32

preemption was not actually litigated and decided in the 2003 Litigation, the Nation was required to raise it at that time and cannot do so now. Again, we disagree.

"Under the doctrine of . . . claim preclusion, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 499 (2d Cir. 2014) (internal quotation marks omitted). Of course, given the liberal rules regarding joinder of claims, *see* Fed. R. Civ. Pro. 18, claim preclusion does not bar every claim that *could* have been raised in a prior action. Rather, for claim preclusion to apply, the later suit must "involv[e] the same cause of action" as the earlier suit. *EDP Med. Computer Sys., Inc. v. United States*, 480 F.3d 621, 624 (2d Cir. 2007) (internal quotation marks omitted). "Suits involve the same claim (or 'cause of action') when they arise from the same transaction, or involve a common nucleus of operative facts. *Lucky Brand Dungarees v. Marcel Fashions Grp.*, 140 S. Ct. 1589, 1595 (2020) (citations and internal quotation marks omitted).

The Village argues that, even though the Nation had not begun gaming (nor had it passed a gaming ordinance that the NIGC would need to approve

33

before the Nation could legally commence gaming under IGRA) when it filed the 2003 Complaint, it had formed an intention to do so and, accordingly, was required to interpose an IGRA preemption claim at that point. Under this view, the "transaction" is the Nation's course of conduct from its purchase of the Parcel until the opening (and closing, and reopening) of Lakeside. But even assuming that the pre-enforcement challenge proposed by the Village would have been ripe – a contention that the Nation rejects but that we need not and thus do not resolve – the Village's argument reaches too far.

We and several of our sister circuits have long held that, for the purpose of analyzing claim preclusion, "the scope of the litigation is framed by the complaint at the time it is filed." *Computer Assocs. Int'l v. Altai, Inc.*, 126 F.3d 365, 369-70 (2d Cir. 1997) (cleaned up).[10] Consequently, "[w]here the facts that have

---

[10] The Village argues that this rule "evolved in the context of serial violations of copyright, trademark, securities, antitrust and other laws perpetrated by a serial wrongdoer . . . [and] is properly limited to serial violation cases." Appellants' Br. at 36-37. While the Village may be correct that we have most frequently applied this facet of claim preclusion doctrine in serial violation cases, neither we nor our sister circuits have ever understood it to be limited to those contexts. Nor would limiting the rule in that fashion serve its underlying purpose, *i.e.*, to bring "certainty and predictability" to this area of the law by avoiding "disputes about whether plaintiffs could have amended their initial complaints to assert claims based on later-occurring incidents." *Morgan v. Covington Twp.*, 648 F.3d 172, 178 (3d Cir. 2011) (collecting cases).

accumulated after the first action are enough on their own to sustain the second action, the new facts clearly constitute a new 'claim,' and the second action is not barred by [claim preclusion]." *Storey v. Cello Holdings, LLC*, 347 F.3d 370, 383 (2d Cir. 2003); *see also Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2305 (2016) ("[D]evelopment of new material facts can mean that a new case and an otherwise similar previous case do not present the same claim.").

Here, the current litigation arises out of facts that have accumulated since the first action that are more than enough on their own to support it. When the 2003 Complaint was filed, the Nation had not begun gaming, and the Village had not sought to enforce the 1958 Ordinance. Instead, the Village cited the Nation for failing to comply with altogether different regulations – those relating to zoning and construction – and the Nation claimed complete immunity from local jurisdiction. IGRA, notably, would not have provided the Nation with a defense against any of the ordinances that the Village was seeking to enforce, none of which related to gambling.

By 2013, the state of play had changed significantly. The Supreme Court's decision in *Sherrill* having undermined its claim to broad immunity from local regulation, the Nation had endeavored to comply with various applicable

building codes and the like – the precise sort of regulations from which it had claimed immunity in 2003 – but was actively conducting a gambling operation on the Parcel. It was at that point that the Village sought to enforce the 1958 Ordinance; in response to that enforcement effort, the Nation sought a declaration not that it is *immune* from Village law as a quasi-sovereign entity, but that the specific sliver of local law that the Village was attempting to enforce is *preempted* by a specific federal statute. Although the two proceedings may "involve[] the same parties, similar or overlapping facts, and similar legal issues," *Interoceanica Corp. v. Sound Pilots, Inc.*, 107 F.3d 86, 91 (2d Cir. 1997) (citation omitted), we readily conclude that the two sets of threatened enforcement actions represent discrete transactions so as to render claim preclusion inapplicable.

Nor does our decision in *Waldman v. Village of Kiryas Joel* command a contrary result. 207 F.3d 105 (2d Cir. 2000). There, we affirmed the dismissal of certain claims in Waldman's third complaint against the Village of Kiryas Joel after concluding that it was barred by his two prior suits against the same municipality, even though the relief that he sought in the third case – an order dissolving the Village of Kiryas Joel – was distinct from the relief that he had

36

sought in the prior cases. *Id.* at 112-14. But while the Village of Union Springs argues that the situation is essentially identical here, it ignores the fact that our decision in that case was premised on the fact that the incidents giving rise to the claims at issue in the third complaint had already occurred when the prior complaints were filed. *Id.* at 110-12. We therefore concluded that Waldman could not avoid preclusion merely by including some new facts while also "claim[ing] that the Village [of Kiryas Joel] may be dissolved *solely* on the basis of facts that have existed for over two decades." *Id.* at 112 (emphasis in original). In contrast, as we held in *Computer Associates*, "[w]ithout a demonstration that the conduct complained of in the [second] action occurred prior to the initiation of the [first] action, [claim preclusion] is simply inapplicable." 126 F.3d at 369. As already discussed, the claims in this case arise out of events that entirely postdate the 2003 Complaint. Consequently, *Waldman* is inapposite.

Ultimately, the Village mistakes its plausible argument that the Nation *could* have litigated this claim in 2003 as providing support for its assertion that the Nation therefore was *required* to litigate this claim in 2003. But claim preclusion has never been so broad as to require a party to do what the Village insists that the Nation should have done in 2003: comb the books for every

ordinance that could be enforced against any use the Nation might make of the property and challenge them all or forever forego the right to challenge any of them. Thus, while we do not foreclose the possibility that claim preclusion might appropriately bar a case where a party "launch[es] a series of lawsuits to challenge different local laws . . . despite the lawbreaker knowing the full universe of laws that apply to its actions," Appellants' Br. at 36, the litigation history between the parties here falls short of that characterization. We therefore reject the Village's assertion of claim preclusion.

## II. The Merits

This case turns on a straightforward question of statutory interpretation. As we and our sister circuits have held, IGRA preempts all state and local legislation and regulation relating to gambling conducted on "Indian lands," as defined in that statute. *See Mashantucket Pequot Tribe v. Town of Ledyard*, 722 F.3d 457, 469-70 (2d Cir. 2013) (noting that IGRA "was intended to expressly preempt the field in the governance of gaming activity on Indian lands"), quoting *Gaming Corp. of Am. v. Dorsey & Whitney*, 88 F.3d 536, 544 (8th Cir. 1996); *see also, e.g.*, *Pueblo of Pojoaque v. New Mexico*, 863 F.3d 1226, 1235 (10th Cir. 2017) (IGRA "expressly preempt[s] state regulation of gaming activity that occurs on Indian

38

lands") (emphasis omitted). The dispositive question, thus, is whether the Parcel sits on Indian lands within the meaning of IGRA. We readily conclude that it does.

"In interpreting a statute, we look first to the language of the statute itself. When the language of the statute is unambiguous, judicial inquiry is complete." *Marvel*, 310 F.3d at 289-90 (cleaned up). Here, we need look no further than the plain language of IGRA.

IGRA defines "Indian lands" as:

> (A) all lands within the limits of any Indian reservation; and
> (B) any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power.

25 U.S.C. § 2703(4). That definition is notably expansive, encompassing "*all* lands within the limits of *any* Indian reservation." Taken alone or in combination, the terms "any" and "all" convey nearly limitless breadth. *See, e.g.*, *United States v. Gonzales*, 520 U.S. 1, 5 (1997) ("Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'"), quoting

39

Webster's Third New International Dictionary 97 (1976). Moreover, "Congress did not add any language limiting the breadth of [these words], so we must read [IGRA] as referring to all [reservations]." *Id.* As the parties have stipulated, and as every state and federal court to consider the issue has concluded,[11] the Cayuga Reservation has not been disestablished and persists today within the boundaries set forth in the Treaty of Canandaigua. The Parcel sits within those boundaries. That would seem to be the end of the matter.

In the face of this clear language, the Village contends that the term "reservation" implies the exercise of tribal jurisdiction, which, the Village reasons, the Cayugas cannot lawfully do within their reservation under *Sherrill*. But we need not resolve whether the Nation's apparent exercise of, at a minimum, concurrent jurisdiction over the Parcel and other property that it owns within the Cayuga Reservation (represented, for example, by its police force and court system) may be logically squared with *Sherrill*'s holding because the relevant definition of "Indian lands" contains no requirement that a tribe exercise jurisdiction or other governmental power over reservation property. That

---

[11] *See, e.g.*, *Cayuga Indian Nation of N.Y. v. Gould*, 14 N.Y.3d 614, 639-40 (2010) (collecting cases).

40

conclusion is reinforced by the fact that IGRA's secondary definition of Indian

lands, which applies to restricted fee and trust lands, *does* contain a requirement

that the tribe "exercise[] governmental power" over those lands. 25 U.S.C.

§ 2703(4)(B). And "[w]here Congress includes particular language in one section

of a statute but omits it in another section of the same Act, it is generally

presumed that Congress acts intentionally." *Russello v. United States*, 464 U.S. 16,

23 (1983) (internal quotation marks omitted).[12] We presume that intention here

and thus discern no basis to read extratextual limitations into the statute.

Equally unpersuasive is the Village's contention that Congress could not

have intended the term "reservation" to encompass what it characterizes as a

"not disestablished ancient reservation that is stripped of tribal jurisdiction."

Appellants' Br. at 45. Setting aside the basic principle that we have "no roving

license, in even ordinary cases of statutory interpretation, to disregard clear

language simply on the view that . . . Congress must have intended something

---

[12] Of course, another provision of IGRA limits class II gaming to "Indian lands within such tribe's jurisdiction," 25 U.S.C. § 2710(b)(1). However, that provision is relevant only to whether gaming is legal under IGRA, which the Village lacks authority to enforce. Accordingly, we need not address the Village's arguments regarding that provision. To the extent that the Village takes issue with the NIGC's decision to authorize and regulate gambling at Lakeside, its remedy is to seek judicial review of that decision. *See* 25 U.S.C. § 2714.

[narrower]," *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 794 (2014), the backdrop against which IGRA was enacted does not support the Village's position in any case. By 1988, it was well understood that "[o]nce a block of land is set aside for an Indian Reservation *and no matter what happens to the title of individual plots within the area*, the entire block retains its reservation status until Congress explicitly indicates otherwise." *Solem*, 465 U.S. at 470 (emphasis added). Moreover, the Cayuga Reservation's existence had not been forgotten to history: claims concerning the Oneida Nation's reservation, established by the Treaty of Canandaigua and acquired by New York State thereafter, had twice reached the Supreme Court within the preceding 15 years, and the Cayuga Nation was actively pursuing claims related to its own reservation. And, as countless Acts of Congress make clear, when Congress wishes to exclude specific reservations from the scope of legislation, it knows how to do so. *See, e.g.*, Dawes Act § 8, 24 Stat. at 390. Much as the Village may argue otherwise, it plainly did not do so here.

Finally, the Village's position is irreconcilable with the Supreme Court's recent decision in *McGirt v. Oklahoma*, in which the Court held that the Creek reservation, encompassing a significant portion of northeastern Oklahoma,

including much of the city of Tulsa, remained "Indian country" under the MCA and, accordingly, that the State of Oklahoma lacked authority to prosecute Native Americans for crimes committed against other Native Americans committed thereon. 140 S. Ct. at 2476-82. The Village attempts to dismiss *McGirt* as merely a case concerning the interpretation of specific treaties. However, while much of the decision focuses on whether the Creek reservation survived certain historical developments, the Court nevertheless made it absolutely clear that, because the reservation persists, "the MCA applies to Oklahoma according to its usual terms." *Id.* at 2478. That is so despite the fact that, as Oklahoma argued in that case and the Village argues in this one, "Tribe members today constitute a small fraction of those now residing on the land." *Id.* at 2470. Given that the MCA's definition of Indian country is largely identical to IGRA's definition of Indian lands, we can only conclude that IGRA applies to the Cayuga Reservation.

Moreover, while *McGirt* does not cite or otherwise mention *Sherrill*, the Court's forceful reaffirmation in *McGirt* of Congress's singular power to disestablish a reservation further underscores the infirmity of the Village's position here. The Village would have us read *Sherrill* to hold that the Cayuga Reservation is a "de facto *former* reservation[]" that "[does not] exist today in any

43

real world sense." Appellants' Br. at 45 (emphasis in original). Adopting the Village's position, however, would be akin to interpreting *Sherrill* to have effectively disestablished the Cayuga Reservation. To the extent that were ever a plausible interpretation of *Sherrill*, *McGirt* forecloses it.[13]

Accordingly, we hold that the Parcel qualifies as "Indian lands" within the meaning of IGRA and that IGRA accordingly preempts any and all state or local laws that directly or indirectly purport to regulate or limit gaming on the Parcel, including the 1958 Ordinance. Because the 1958 Ordinance is preempted entirely, we need not decide whether IGRA's criminal enforcement provision vesting exclusive jurisdiction in the federal government to enforce state gambling law in "Indian country" as defined under the MCA, 18 U.S.C. § 1166, supersedes 25 U.S.C. § 232's grant of criminal jurisdiction over tribal members to New York

---

[13] Even prior to *McGirt*, the Village's reading of *Sherrill* would be hard to square with the actual holding of that case and the Court's well established disestablishment jurisprudence. As the New York Court of Appeals succinctly put it in 2010, "*Sherrill* dealt with whether a tribe could exercise sovereign power over reacquired land for purposes of avoiding real property taxes – not whether reacquired land is ascribed reservation status under federal law." *Gould*, 14 N.Y.3d at 641-42.

State.[14]

## CONCLUSION

For the reasons stated herein, the judgment of the district court is

AFFIRMED.

---

[14] Though we need not resolve the Nation's sovereign immunity claim for the same reason, we note that all parties now agree that the portion of the judgment below providing that "[t]he Nation enjoys tribal sovereign immunity from any suit by defendants to enforce the [1958] Ordinance," 448 F. Supp. 3d at 246, is correct under our decision in *Cayuga Indian Nation of N.Y. v. Seneca Cty.*, 978 F.3d 829 (2d Cir. 2020). We express no view as to whether the Village would be able to seek prospective injunctive relief against individual tribal officials compelling compliance with the 1958 Ordinance were it not otherwise preempted.